[No. B215594. Second Dist., Div. Eight. June 10, 2010.]

TOM MUNOZ et al., Plaintiffs and Respondents, v.
BCI COCA-COLA BOTTLING COMPANY OF LOS ANGELES,
Defendant and Respondent;
GREG (TONY) GREENWELL, Objector and Appellant.

**COUNSEL**

Righetti Law Firm, Matthew Righetti and John Glugoski for Objector and Appellant.

Law Offices of James P. Stoneman II, James P. Stoneman II; Law Offices of Mark R. Haddon and Mark R. Haddon for Plaintiffs and Respondents.

Jennifer B. Robinson, T. Harold Pinkley and Tara L. Ferguson for Defendant and Respondent.

**OPINION**

**GRIMES, J.—**

## SUMMARY

Tom Munoz and Phillip Eichten filed a class action lawsuit against BCI Coca-Cola Bottling Company of Los Angeles (BCI), seeking damages and penalties for allegedly unpaid overtime wages, missed meal and rest period wages, and other Labor Code violations and unfair business practices. The proposed class consisted of production supervisors and merchandising supervisors who were allegedly misclassified by BCI as exempt employees. After

mediation before a respected mediator, the parties agreed to settle the matter for $1.1 million. Notice of the proposed settlement elicited one objection. Two of the 188 class members opted out of the class and 142 submitted valid claim forms, so that the average net payment to each class member would be about $4,300. The trial court found the settlement fair and reasonable.

The objector, Greg (Tony) Greenwell, appeals. He argues the trial court abused its discretion in approving the settlement, principally because the parties did not provide the court with the information necessary to make a finding that the settlement was reasonable and fair. We find no merit in Greenwell's contentions and affirm the trial court's order approving the settlement.

## FACTUAL AND PROCEDURAL BACKGROUND

In June 2008, Munoz and Eichten (collectively, Munoz) filed a class action complaint against BCI. Munoz asserted causes of action for failure to pay overtime wages, waiting time penalties (penalties for late payment of wages to terminated employees), failure to provide or authorize meal and rest periods, failure to provide accurate itemized wage statements, and unfair business practices. The proposed class consisted of persons employed by BCI in salaried positions as production supervisors or merchandising supervisors in the State of California at any time during the four-year period preceding the filing of the complaint. Central to Munoz's action was the claim that production and merchandising supervisors were intentionally misclassified as exempt employees by BCI, which used the misclassification scheme to justify failure to pay overtime wages and provide meal and rest periods to those employees.

The Munoz class action followed earlier class action litigation against BCI, prosecuted by the same counsel representing Munoz in this case (and defended by the same counsel representing BCI here), styled *Costanza v. BCI Coca-Cola Bottling Company of Los Angeles* (*Costanza*). The *Costanza* class action, filed in April 2006, asserted the same causes of actions as in this case, and initially defined the class as all persons employed by BCI as salaried supervisors in California. By the time of the fifth amended complaint (filed May 3, 2007), the *Costanza* class was refined to consist of full-service supervisors, warehouse supervisors, and delivery (or distribution) supervisors, and no longer included production or merchandising supervisors.

Discovery conducted in the *Costanza* litigation before the class was narrowed included detailed analyses of the job duties of numerous supervisory positions, including the production supervisor and merchandising supervisor positions that are at issue in this case.[1] BCI's discovery answers identified 20 different job duties performed by some or all production supervisors, and 18 different job duties performed by some or all merchandising supervisors. BCI's answers also indicated that the job duties and time spent performing each of the duties varied from supervisor to supervisor and from week to week, as well as by facility and season. The class representative for the production supervisor position in the *Costanza* case also responded to BCI's requests for information relating to his claims for unpaid overtime, meal and rest breaks, and so on.

The *Costanza* case, with 377 class members, was settled in November 2007, with BCI paying $2.25 million. No one opted out or objected, and final approval by the trial court was granted March 18, 2008.

Several months later, on June 9, 2008, this case was filed, asserting the same causes of action as in *Costanza*. Some discovery was conducted: BCI propounded form interrogatories and requests for production of documents to Munoz and Eichten, and special interrogatories to Munoz, and verified responses were provided; Munoz propounded requests for admission and form interrogatories to BCI, and BCI provided verified responses. BCI obtained declarations from 30 class members from several California facilities. These declarations described the declarant's job duties; amounts of time spent performing various duties; his or her authority (or not) to hire, fire, or discipline; the number of hours he or she worked each week and each day; and whether or not he or she took meal and rest breaks. On November 5, 2008, BCI produced payroll data for each production supervisor and merchandising supervisor during the relevant time period.

On November 15, 2008, the parties participated in a mediation (with the same mediator who conducted the *Costanza* mediation); the mediation was unsuccessful, but the parties continued to work with the mediator and agreed to settlement terms on December 1, 2008: $1.1 million (none of which would revert to BCI if unclaimed, but rather would be distributed pro rata to class members who made claims), from which deductions would be made for attorney fees (30 percent), $10,000 in incentive awards for the class representatives ($5,000 each), costs (up to $10,000), and administrative costs.

The parties moved for preliminary approval of the settlement on December 15, 2008. A supporting declaration from class counsel (James P. Stoneman)

---

[1] The Munoz brief states the class was narrowed in the *Costanza* case "due to problems regarding adequacy of the class representatives . . . ."

described his qualifications and experience in employment and class action matters, and indicated there were "several hotly contested factual and legal issues regarding the amount of wages, interest, and penalties for which [BCI] could ultimately have been found liable" and, depending on the resolution of those issues, "total liability estimates range considerably, with a distinct possibility that [BCI] would have prevailed on any of the contested issues, including the critical issue whether class certification would have been granted." Counsel also declared that the settlement was the product of "serious, informed, non-collusive, arms-length negotiations" and ensured payment "of some measure of damages rather than suffering lengthy delays and appeals with the possibility of no recovery at all." The court gave preliminary approval to the proposed settlement, provisionally certified the class, ordered notice to class members of the proposed settlement, and set a hearing for final approval to be held on March 23, 2009.

Greenwell filed a notice of objection and his opposition to final approval of the settlement. He argued, among other things, that the release to be given by the class was overly broad;[2] the parties failed to provide the total potential value of the claims being released; the settlement sum was "relatively low"; there was "a lack of meaningful pre-trial discovery" making it difficult to intelligently evaluate the value of the claims and compare it to the settlement amount; and the notice to class members did not provide sufficient information to allow members to calculate how much they could expect to receive for their claims. A supplemental brief from Greenwell also pointed out that the notice to the class had not included the "request for exclusion" form ordered by the court, instead stating that class members could exclude themselves by submitting a signed letter stating their intent to opt out of the settlement.

Munoz moved for final approval of the class action settlement in March 2009. The Munoz motion was supported by declarations from both lawyers for the class (Mark Haddon and James Stoneman), repeating the information given in the previous Stoneman declaration. Haddon also provided the rationale for the change from use of an exclusion form to use of a letter for opt-out purposes; stated that the gross and net benefit amounts that each class member would receive for each workweek (assuming 100 percent participation) would be $74.25 and $41.29, respectively; and reported that there were only two opt outs and one objection to the settlement.

A week later, Munoz filed his opposition to the Greenwell objection, again supported by declarations from Haddon and Stoneman. Haddon explained

---

[2] The release covered "all individual and class wage and hour claims that were asserted or could have been asserted" in the complaint, including claims relating to *any* position a class member held at BCI during the class period, not just claims relating to the merchandising and production supervisor positions.

that he and Stoneman had conducted significant amounts of discovery relevant to the production and merchandising supervisor positions in the *Costanza* case, as well as a lesser amount in the present case (all described at pp. 402–403, *ante*), allowing them to prepare the Munoz case for mediation in a much shorter time. Stoneman's declaration provided copies of BCI's responses to interrogatories and requests for admission in *Costanza* that provided substantive information on the duties of merchandising supervisors and production supervisors. Stoneman also declared that documents provided by BCI in *Costanza* verified BCI's contention that certain supervisors, including certain production supervisors, "were strongly disinclined and strongly discouraged from performing nonexempt tasks because those tasks were performed by union employees and the union had filed grievances which caused the supervisors to be warned not to perform the nonexempt tasks . . . ." Stoneman described other points counsel had also considered in connection with the settlement negotiations: "We also considered other relevant and timely considerations, such as the fact that the leading meal break case in the state, *Brinker Restaurant Corp. v. Superior Court of San Diego County*, in which certification had been denied (again) by the Fourth District Court of Appeals, had been adopted as the relevant meal break standard by the State of California Department of Labor Standards. We also considered the possible ramifications of the Supreme Court's grant of review of *Brinker*, and the fact that the meal break aspect of our case would be gutted if *Brinker* is not overruled."[3]

BCI also opposed Greenwell's objection. BCI submitted copies of all the discovery in *Costanza* and in this case (as previously described), including the payroll data for all production and merchandising supervisors and the 30 declarations from class members containing testimony relevant to certification and exempt/nonexempt issues. BCI pointed out, among other things, that Greenwell cited no authority for his claim the release was overly broad and that the very same release language was approved in the *Costanza* case.[4]

At the hearing on final approval, Greenwell argued the court did not have the information necessary "to understand the amount in controversy" or "the potential recovery they would have obtained" had the matter gone to trial,

---

[3] In *Brinker*, the Court of Appeal held that employers need only provide meal and rest periods, not ensure they are taken, so that individual issues predominated and the meal and rest period claims were not amenable to class treatment. (*Brinker Restaurant Corp. v. Superior Court* (2008) 165 Cal.App.4th 25, 31 [80 Cal.Rptr.3d 781], review granted Oct. 22, 2008, S166350 [85 Cal.Rptr.3d 688, 196 P.3d 216].)

[4] BCI also pointed out that, the day before the trial court preliminarily approved the settlement in this case, Attorney John Glugoski (who represents Greenwell in this case), filed a class action lawsuit against BCI on behalf of Jose Daguna, a production supervisor and one of the two persons who later opted out of this action, making the same allegations as in this action.

and this was because class counsel did not conduct adequate discovery to provide that information to the court. BCI pointed out that 75 percent of the class opted into the case, compared with the average 25 to 30 percent in a wage and hour case; none of the settlement funds revert back to BCI, instead increasing the recovery of those filing claims; the average recovery was $4,300 per claimant; and there was "a huge risk" the case would not be certified, based on declarations from 15 percent of the class showing the variances in hours worked, job duties, whether meal breaks were taken, and so on, which "fully substantiate[d] the significant risk that there would be no certification." The broad release, BCI argued, was justified by the nonreversionary settlement: "I paid more to get that broad release." Class counsel added that the discovery before the court included payroll data for class members, and that "[w]e did calculate a worst case-best case scenario. The worst case being zero and our best case scenario, I believe, is work product." Counsel observed that "[i]f Mr. Glugoski [(Greenwell's counsel)] would like to put a value on the case, the information was available to him as well." And, in the class action Glugoski filed in December 2008 on behalf of production supervisors (see fn. 4, *ante*), the complaint indicated that total damages would not exceed $5 million.

The trial court approved the settlement, stating: "[I]t seems to me that this case—you know, it may not be certifiable from the standpoint that the complaint alleges that BCI had, in effect, misclassified production and merchandising supervisors who were, therefore, entitled to overtime premiums, waiting time[] penalties and meal and rest period violation payments, penalties for failure to provide accurate itemized wage statements, injunctive [and] declaratory relief, interest and attorney fees. [¶] Because of the standing of each one of these individuals in the particular facts of each case, I think it would be extremely difficult to try this case. [¶] So after reviewing this and listening to Mr. Glugoski's presentation and reading your papers, I think you did a very good job on it. The objections of the objector are overruled. [¶] In my opinion, the final settlement in this case is fair, reasonable, adequate, considering the claimants are going to receive some $4,300 each of the class. And I think that is a good deal in this case. It is as good a deal as you can get."

On April 7, 2009, the trial court signed the order approving the settlement and overruling Greenwell's objection. The court found the settlement fair, reasonable and adequate; ordered payment of attorney fees and costs of $339,001; found the enhancements for the representative plaintiffs were fair, reasonable and appropriate given their services rendered in the case; approved the payment of claim administration costs of $35,353, the employer's share of employment taxes of $84,205.32, and late claims and unanticipated expenses of $20,000; and ordered BCI to transfer $611,440.68 to the settlement fund for payments to the class members. The court approved the release

of claims relating to any position at BCI held by class members during the claims period, and also modified the joint stipulation the court had preliminarily approved, so that it provided class members could exclude themselves from the settlement class by submitting a signed letter (rather than an exclusion form), further finding that the notice given on this point satisfied the due process requirements of California Rules of Court, rule 3.766(d)(3). The objector filed a timely appeal.

## DISCUSSION

Greenwell argues, as he did in the trial court, that the lack of information on the "amount in controversy" prevents any finding that the settlement is fair and reasonable; that class counsel failed to conduct the requisite degree of discovery to evaluate the claims; that the release is overbroad; and that the parties failed to provide class members with sufficient information to make an informed decision and failed to comply with the class notice procedure (the exclusion form) ordered by the trial court at the time preliminary approval was given. These defects, Greenwell says, mirror those in *Kullar v. Foot Locker Retail, Inc.* (2008) 168 Cal.App.4th 116 [85 Cal.Rptr.3d 20] (*Kullar*) and *Clark v. American Residential Services LLC* (2009) 175 Cal.App.4th 785 [96 Cal.Rptr.3d 441] (*Clark*), both of which found the trial court had abused its discretion in approving a class action settlement. We find no merit in Greenwell's contentions.

We recount first the legal principles governing the approval of a class action settlement, and then turn to the particulars in this case.

### A. *The applicable principles.*

■ Our review of the trial court's approval of a class action settlement is limited in scope. We make no independent determination whether the settlement terms are "fair, adequate and reasonable," but only determine whether the trial court acted within its discretion. (*Kullar, supra,* 168 Cal.App.4th at pp. 127–128.) The trial court's discretion is broad, and is to be exercised through the application of several well-recognized factors. (*Clark, supra,* 175 Cal.App.4th at p. 799.) The list, which " 'is not exhaustive and should be tailored to each case,' " includes " 'the strength of plaintiffs' case, the risk, expense, complexity and likely duration of further litigation, the risk of maintaining class action status through trial, the amount offered in settlement, the extent of discovery completed and the stage of the proceedings, the experience and views of counsel, the presence of a governmental participant, and the reaction of the class members to the proposed settlement.' " (*Kullar,* at p. 128, quoting *Dunk v. Ford Motor Co.* (1996) 48 Cal.App.4th 1794, 1801 [56 Cal.Rptr.2d 483] (*Dunk*).) " ' "The most important factor is the strength of the

case for plaintiffs on the merits, balanced against the amount offered in settlement." ' " (*Kullar, supra,* 168 Cal.App.4th at p. 130.) While the court " 'must stop short of the detailed and thorough investigation that it would undertake if it were actually trying the case,' " it " 'must eschew any rubber stamp approval in favor of an independent evaluation.' " (*Ibid.*)

■ Some cases state that a presumption of fairness exists "where: (1) the settlement is reached through arm's-length bargaining; (2) investigation and discovery are sufficient to allow counsel and the court to act intelligently; (3) counsel is experienced in similar litigation; and (4) the percentage of objectors is small." (*Dunk, supra,* 48 Cal.App.4th at p. 1802.) *Kullar* emphasizes that this is only an initial presumption; a trial court's approval of a class action settlement will be vacated if the court "is not provided with basic information about the nature and magnitude of the claims in question and the basis for concluding that the consideration being paid for the release of those claims represents a reasonable compromise." (*Kullar, supra,* 168 Cal.App.4th at pp. 130, 133.) In short, the trial court may not determine the adequacy of a class action settlement "without independently satisfying itself that the consideration being received for the release of the class members' claims is reasonable in light of the strengths and weaknesses of the claims and the risks of the particular litigation." (*Id.* at p. 129.)[5]

### B. *The settlement in this case.*

■ Applying the principles enunciated in *Kullar*, we find no merit in Greenwell's claim that the trial court abused its discretion in finding the settlement fair and reasonable (or, as the trial court observed, "as good a deal as you can get"). The crux of Greenwell's claim is that the record before the trial court contained no evidence of "the potential value of the claims" in the case, and that this defect violates the teaching of *Kullar*, which observed that "an informed evaluation cannot be made without an understanding of the amount that is in controversy and the realistic range of outcomes of the litigation." (*Kullar, supra,* 168 Cal.App.4th at p. 120; see also *Clark, supra,* 175 Cal.App.4th at p. 801 [citing *Kullar*].) We disagree.

---

[5] *Kullar* continues: "The court undoubtedly should give considerable weight to the competency and integrity of counsel and the involvement of a neutral mediator in assuring itself that a settlement agreement represents an arm's-length transaction entered without self-dealing or other potential misconduct. While an agreement reached under these circumstances presumably will be fair to all concerned, particularly when few of the affected class members express objections, in the final analysis it is the court that bears the responsibility to ensure that the recovery represents a reasonable compromise, given the magnitude and apparent merit of the claims being released, discounted by the risks and expenses of attempting to establish and collect on those claims by pursuing the litigation. 'The court has a fiduciary responsibility as guardians of the rights of the absentee class members when deciding whether to approve a settlement agreement.' " (*Kullar, supra,* 168 Cal.App.4th at p. 129.)

Greenwell misunderstands *Kullar*, apparently interpreting it to require the record in all cases to contain evidence in the form of an explicit statement of the maximum amount the plaintiff class could recover if it prevailed on all its claims—a number which appears nowhere in the record of this case. But *Kullar* does not, as Greenwell claims, require any such explicit statement of value; it requires a record which allows "an understanding of the amount that is in controversy and the realistic range of outcomes of the litigation."[6] (*Kullar, supra*, 168 Cal.App.4th at p. 120.) That record exists in this case.

We entertain no doubt that the trial court had "an understanding of the amount . . . in controversy" (*Kullar, supra*, 168 Cal.App.4th at p. 120), despite the absence of a statement of the maximum value of all claims. The information before the court included the size of the class (188) and the payroll data on all class members during the class period (including total amounts of salaries paid during the class period). It also included declarations from 30 class members (15 percent of the class) indicating the number of hours worked per week and per day (and the significant differences in those numbers): e.g., 70 hours per week, 48 hours per week, 60 hours per week, 42 to 44 hours per week, 55 hours per week, "no more than 50 hours per week," 45 hours per week in winter and 50 to 60 hours per week at other times of the year, eight to nine hours per day, 45 hours per week, and so on. These declarations also showed significant variations in whether or not and how often meal and rest periods were taken, as well as in job duties and time spent on different duties. (And, as Munoz points out, the complaint in the class action filed by Greenwell's counsel on behalf of production supervisors (which was also in the record before the trial court) valued that action at no more than $5 million.) This information, it appears to us, constitutes an adequate basis from which to garner a reasonably adequate "understanding of the amount that is in controversy" within the meaning of *Kullar*.

Greenwell also asserts there was no evidence as to "whether adequate investigation was conducted" and as to the strength of the claims at issue; Greenwell complains at length about the lack of discovery conducted by class counsel, points out that most of the documentation was submitted by BCI, and considers the *Costanza* discovery "of no real value in the context of *Munoz*."[7] But there is no reason why, in the circumstances here, class counsel could not rely on the *Costanza* discovery, and Greenwell cites no authority to

---

[6] Indeed, the standard list of factors a trial court should consider in determining whether a settlement is fair and reasonable does not expressly include specification of the maximum amount of recoverable damages (see *Kullar, supra*, 168 Cal.App.4th at p. 128), and *Kullar* is clear that the most important factor " ' "is the strength of the case for plaintiffs on the merits, balanced against the amount offered in settlement." ' " (*Id.* at p. 130.)

[7] Greenwell points out that the *Costanza* discovery shows BCI objected to (rather than admitting or denying) a request that BCI admit that production supervisors do not have the independent authority to hire and terminate employees as part of their job duties. Greenwell

the contrary. Nor does the fact that BCI submitted much of the documentation somehow operate to make that documentation irrelevant. The salient point is whether the factual record before the court is sufficiently developed to allow the court independently to satisfy itself "that the consideration being received for the release of the class members' claims is reasonable in light of the strengths and weaknesses of the claims and the risks of the particular litigation." (*Kullar, supra,* 168 Cal.App.4th at p. 129.) And our role is not to determine independently whether the settlement terms are fair and reasonable, but only to determine whether the trial judge, whose views are to be accorded " '[g]reat weight,' " acted within his or her discretion. (*Id.* at pp. 127–128.)

As a final observation on this topic, we note that the evidentiary records in *Kullar* and *Clark,* upon which Greenwell relies so heavily, are significantly different from this case. In *Kullar* (which did not involve the misclassification of exempt employees), there was no discovery at all on meal period claims that were added in an amended complaint and were the focal point of the objections to the settlement. (*Kullar, supra,* 168 Cal.App.4th at pp. 121–122.) While *Kullar* class counsel argued that the relevant information had been exchanged informally and during mediation (*id.* at p. 126), nothing was presented to the court—no discovery, no declarations, no time records, no payroll data, nothing (*id.* at pp. 128–129, 132)—to allow the court to evaluate the claim. And in *Clark,* the problem was that the trial court was not given sufficient information on a core legal issue affecting the strength of the plaintiffs' case on the merits, and therefore could not assess the reasonableness of the settlement terms. (*Clark, supra,* 175 Cal.App.4th at p. 798.) The record in this case contains neither of the flaws that doomed the *Kullar* and *Clark* settlements.

In sum, we can see no basis for finding an abuse of discretion. As we have seen, the record contains sufficient information from which the trial court could gain an adequate understanding of the amount in controversy, and there

then points out that to prove an exemption from overtime, the employer has to prove (among other factors) that the class members have "the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring or firing . . . will be given particular weight . . . ." (Cal. Code Regs., tit. 8, § 11070, subd. 1(A)(1)(c).) While Greenwell is correct, the point does not justify his conclusion that the *Costanza* discovery in its entirety was "of no real value . . . ." Indeed, BCI's objection stated in part that the request was unduly burdensome "in that it seeks an individualized inquiry of each person in the Production Supervisor position to ascertain whether he/she has independent authority to hire and terminate employees" and that " 'independent authority' " to hire and terminate employees was not necessary to show that an employee is properly classified as exempt. The declarations in this case showed that the authority of class members with respect to hiring and firing in fact varied: for example, some were not involved in hiring, but had the authority to discipline or to make recommendations about suspension and termination which "are given weight"; others also had "input into hiring" or "made hiring recommendations which have been followed" or which "are given weight"; and so on.

was likewise considerable information from which to assess the strength of the class claims and the risks and expense of litigating them. The question whether the class could be certified, based on the substantial differences in individual circumstances, was a significant one. The uncertain state of the law with respect to meal and rest period claims was likewise a substantial concern. And the " 'reaction of the class members to the proposed settlement' " (*Kullar, supra,* 168 Cal.App.4th at p. 128) was favorable, with only two opt outs and one objection. Under these circumstances, the trial court's observations—that the class "may not be certifiable," that "it would be extremely difficult to try this case," and that $4,300 for each member of the class was "as good a deal as you can get"—were fully supported by the record.

Greenwell makes several other contentions.

First, Greenwell argues the release given by the class members was unreasonably broad, because the class members released claims for any position they may have held at BCI during the class period. (Greenwell also asserts, wrongly, that class members will forfeit any title VII and workers' compensation claims.) Greenwell cites no authority suggesting that the release (which was also used in the *Costanza* settlement) is improper, and BCI points out that, while the release is indeed broad, the settlement is nonreversionary so that BCI is giving something in return for the broader release. Under these circumstances, we see no basis for finding the release is improper as a matter of law.

Second, Greenwell points out that the parties violated the court's preliminary approval order when the notice to the class stated that members could exclude themselves from the class by writing a letter, rather than (as the preliminary approval order stated) including an exclusion form for that purpose. (The claims administrator recommended the change because of its prior experience with class members submitting both claim and exclusion forms.) Again, we cannot say that the trial court abused its discretion when, in its final order, it approved the procedure used after the fact. The trial court obviously was of the view that the change was immaterial, and we have no basis upon which to reach a contrary conclusion.

Third, Greenwell criticizes the notice given to the class because it did not estimate the amount class members would receive under the settlement. BCI explains that, because the settlement is nonreversionary, the amount each member would receive cannot be known in advance (unlike a claims-made,

reversionary settlement), because the amount depends upon how many class members decide to participate in the settlement. (Here, 75 percent of the class will share 100 percent of the net settlement; if the participation rate were lower, each member's recovery would be greater, and vice versa.) Greenwell insists that the notice could have provided the minimum amount, which is "routinely provided in settlements." Again, Greenwell cites no authority for the proposition a settlement must be disapproved merely because the class notice does not calculate the minimum recovery. In light of the fact that 75 percent of the class decided to participate (and only two opted out), no basis exists to conclude this asserted flaw in the notice somehow rendered the settlement unfair or unreasonable.[8]

■ Finally, Greenwell complains about the $5,000 enhancement payments to each of the two class representatives, citing *Staton v. Boeing Co.* (9th Cir. 2003) 327 F.3d 938, 975, where the court observed that if class representatives expect routinely to receive special awards in addition to their share of the recovery, " 'they may be tempted to accept suboptimal settlements at the expense of the class members whose interests they are appointed to guard.' " (*Id.* at pp. 975; see *id.* at pp. 977, 946, 948 [rejecting payments to named plaintiffs that averaged more than $30,000 each, compared with average payouts to unnamed class members of about $1,000].) But it is established that named plaintiffs are eligible for reasonable incentive payments to compensate them for the expense or risk they have incurred in conferring a benefit on other members of the class. (*Id.* at p. 977; *Clark, supra*, 175 Cal.App.4th at pp. 806, 805 [rejecting as an abuse of discretion enhancements of $25,000 each that gave named plaintiffs at least 44 times the average payout to a class member].) Here, the named plaintiffs will receive (when the enhancement is added to their individual recoveries) more than twice as much as the average payment to class members of $4,300— compared to the multipliers of 30 and 44 in *Clark* and *Staton*—and Greenwell cites no authority for the proposition that an award of this magnitude is unreasonable on this record. Under these circumstances, we have no basis for concluding the trial court abused its discretion in finding the enhancements to be "fair, reasonable and appropriate given [Munoz's and Eichten's] services rendered in this case."

---

[8] Greenwell also complains that the settlement assumed, in calculating compensable workweeks for class members, that one year of employment was equal to 48 workweeks, rather than 52 workweeks; he says that, even assuming "the standard 2 weeks vacation per year," "employees are cheated out of two to four workweeks per year." Greenwell does not explain the significance of this point; the same standard was applied to all class members and it is hard to see how the use of a different number (48, 50 or 52) would change a class member's proportionate share in the settlement fund.

## DISPOSITION

The order approving the class action settlement agreement and entering judgment is affirmed. The respondents shall recover their costs on appeal.

Bigelow, P. J., and Flier, J., concurred.

A petition for a rehearing was denied August 2, 2010, and appellant's petition for review by the Supreme Court was denied September 29, 2010, S185342.