6/21/16 Opinion following order vacating prior opinion

# CERTIFIED FOR PARTIAL PUBLICATION[*]

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| WANKYU CHOI et al., | B257480 |
| Plaintiffs and Respondents; | (Los Angeles County Super. Ct. No. BC501173) |
| MARY RESTAINO et al., | |
| Plaintiffs and Appellants, | |
| v. | |
| MARIO BADESCU SKIN CARE, INC., et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, William F. Highberger, Judge.  Affirmed.

The C2 Law Group, Erica E. Hayward; The Rudd Law Firm, Christopher L. Rudd; Whitfield Bryson & Mason, Gary E. Mason and Esfand Y. Nafisi for Plaintiffs and Appellants Mary Restaino, Geoffrey Yu, Theresa Stern Valentic, Betty Huang and Zoe Herold.

Law Offices of Ronald A. Marron, Ronald A. Marron, Skye Resendes; and C. Benjamin Nutley for Plaintiff and Appellant Donna McLaren.

---

[*]    Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for partial publication.  The portions of this opinion to be deleted from publication are those portions enclosed within double brackets, [[ ]].

Law Office of Young W. Ryu, Young W. Ryu; Law Offices of Gerald S. Ohn and Gerald S. Ohn for Plaintiffs and Respondents.

Tucker Ellis, Ronie M. Schmelz and Rebecca A. Lefler for Defendants and Respondents.

_____

## INTRODUCTION

Jae K. Lee and Wankyu Choi sued Mario Badescu Skin Care, Inc. and Mario Badescu for marketing and labeling two face creams without disclosing all of the ingredients. Plaintiffs sought economic damages and equitable relief on behalf of themselves and a nationwide class of face cream purchasers. Before the class was certified, defendants agreed to settle the action. Nine class members, who timely objected, appeal raising numerous contentions. In the unpublished portion of this opinion, we hold that the objectors have not demonstrated error. In the published portion of this opinion, we hold that the one-time publication of the notice of settlement did not violate the Consumers Legal Remedies Act (Civ. Code, § 1750 et seq. (CLRA)). Accordingly, we affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *The complaint*

In December 2012, the Korean Ministry of Food and Drug Safety suspended the sales of defendants' Healing Cream after testing revealed the product contained two unlabeled corticosteroids, hydrocortisone and triamcinolone acetonide. The recall advised consumers to cease using the cream and warned that long-term use of steroids could lead to skin atrophy and enlarged capillaries.

Plaintiffs Lee and Choi (together plaintiffs, the named plaintiffs, or class representatives) purchased defendants' Healing Cream and used it.[1] Their attorneys had

_____

[1]    The two named plaintiffs attached declarations to their response to objections, in which they stated they "personally used Mario Badescu Healing Cream" after receiving it.

2

the purchased creams tested by an independent laboratory and discovered the presence of 2610 µg/g of hydrocortisone and 1899 µg/g of triamcinolone acetonide.  The named plaintiffs filed this consumer class action against defendants on behalf of all persons residing in the United States who purchased defendants' Healing Cream.

The operative complaint alleged that defendants represented through marketing, advertising, labeling, and other forms of promotion, that the Healing Cream prevented acne scars and speeded up the healing process for irritated or acne-erupted skin,[2] but "failed to disclose that [defendants'] Healing Cream products contain levels of Hydrocortisone and Triamcinolone Acetonide, which are steroid substances with serious side effects.  [¶] . . . [¶]  Triamcinolone is a synthetic **corticosteroid** used to treat various skin conditions. . . .  Triamcinolone Acetonide . . . is a **DOCTOR'S PRESCRIPTION ONLY** medicated cream . . . ."  The complaint alleged that the class overpaid for the product because its value was diminished at the time it was sold to consumers.  Had the class members been aware that the cream contained hydrocortisone and triamcinolone acetonide, they would not have purchased the product, would have paid less for it, or would have purchased another competing product.

The complaint asserted causes of action for violation of the CLRA; fraudulent concealment; false advertising in violation of Business and Professions Code section 17500, all of which violated Business and Professions Code section 17200; breach of express and implied warranties; and false and misleading advertisement in violation of the Magnuson-Moss Warranty Act (15 U.S.C. § 2301 et seq.).  Plaintiffs sought an order certifying a nationwide class and a California subclass, and sought injunctive relief, restitution, monetary damages, punitive damages, and attorney fees.  Defendants stopped selling the creams after the complaint was filed.

---

**2**    Plaintiffs alleged that the Healing Cream's label listed the ingredients as " 'Balsam (Myroxylon Pereirae Resin) Peru, Polyglycerlmenthacrylate (and) Propylene Glycol, Herbal Extract, Bismuth Subgallate,' "  but that "[d]efendants did not disclose that the Healing Cream contained **STEROIDS**."

[[Begin nonpublished portion.]]

2. *The litigation*

In April 2013, the parties filed a joint initial status conference and class action response statement. Defendants anticipated moving for summary judgment to address preemption, standing, causation, and damages. Commencing in May 2013, after demurrers, motions to strike, and amendments to the complaint, plaintiffs served defendants with approximately 300 discovery requests in the form of multiple sets of interrogatories, demands for production, and requests for admission. Defendants submitted multiple responses and supplemented responses. Also in May 2013 when plaintiffs served their first round of discovery, their attorneys began preparing for a settlement meeting and interviewed a class action administrator about settlement issues.

Pursuant to trial court order, in August 2013, the parties negotiated a protective order under which defendants produced 359 pages of documents concerning the revenue from the sale of their cream. Based on defendants' discovery responses, plaintiffs added to their motion for final approval claims that in addition to the Healing Cream, defendants failed to disclose that their Control Cream also contained levels of hydrocortisone and triamcinolone acetonide. Defendants reported that they sold approximately 160,000 units of creams, more than half of which sales were made to retailers. Plaintiffs learned from defendants' supplemental responses to plaintiffs' second and third sets of special interrogatories that defendants' revenue from the sale of both creams during the class period was approximately $2.5 million.

[[End nonpublished portion.]]

3. *The settlement*

The parties underwent mediation and conducted settlement discussions that continued after mediation. The parties reached a settlement of the action on behalf of the class (the settlement agreement). On November 20, 2013, they moved the trial court for preliminary certification of the class and approval of the stipulation of settlement.

a. *the settlement's quid pro quo*

The settlement agreement identified one class, defined as "all persons in the United States who purchased one or more of Defendants' Healing Cream or Control Cream from February 15, 2009 up to and including the Notice Date." Defendants agreed to an injunction under which they would no longer market, advertise or sell either cream unless the labels and all descriptions and advertisements of the products disclosed all of the ingredients contained therein. Defendants also agreed to provide each class member, who submitted a timely claim form, with a certificate entitling the claimant to $45 off any purchase of any of defendants' products. Class members who demonstrated they had purchased both creams would be entitled to two certificates. The coupons could not be redeemed for cash, were nontransferable, and expired in 180 days. Defendants agreed not to oppose an attorney fee application for $1.2 million, and incentive payments of $3,000 to plaintiff Lee, and $2,000 to plaintiff Choi.

b. *the settlement's release*

The settlement agreement provided that the class would release all claims and causes of action "arising from or related to the Products and claims at issue in the Action" that were asserted or could reasonably have been asserted in the lawsuit, and that the release would be construed as broadly as possible. *Expressly excluded from the release were all claims for personal injuries.* The stipulation of settlement stated, "Notwithstanding any other provision of this Stipulation of Settlement . . . Plaintiffs and Class Members are *not releasing any claims, demands, rights, damages, obligations, suits, debts, liens, and causes of action relating to personal injuries arising from their use of any of the Products.*" (Italics added.)

4. *The notification*

The trial court provisionally certified the class for settlement purposes and preliminarily approved the settlement. The court modified the proposed notice methodology to require that e-mail notices include hyperlinks to the long form notice and

5

the claim form.  The court approved appointment of the settlement administrator agreed to by the parties, and ordered that notice of pendency and settlement be given to the proposed class according to the agreement.

After notice as approved by the trial court was sent, the named plaintiffs moved for final approval of the class settlement.  Plaintiffs' attorney declared that based on available information, approximately 36,954 class members purchased about 65,495 units of the creams through defendants' website or at their New York spa during the class period, indicating a purchasing pattern under which each member bought 1.8 units of the cream.  The settlement administrator received from defendants the names and addresses or e-mails for class members who purchased products through defendants' website or at their spa.  After culling duplicates, the settlement administrator identified 33,331 valid e-mail addresses to which it sent summary notices, and 3,623 valid street addresses to which it sent long form notices, pursuant to the trial court's preliminary approval order. The settlement administrator sent 32,092 reminder notices in March 2014.  After tracking 248 addressees whose mail was undeliverable, the administrator sent new notices by April 2014.  The administrator established a Post Office Box address and a website to answer questions and provide additional information about the settlement.

In addition to the website and spa sales, another approximately 91,000 units of the creams were shipped by defendants to retailers around the country.  On January 26, 2014, the settlement administrator published the summary notice in Parade Magazine, which has a circulation of more than 32 million and is distributed to 600 newspapers nationwide.  The administrator also activated a toll free telephone number.

As of April 29, 2014, two months after the deadline for opting out of the class, the parties estimated the class size to be around 86,000 members of which 42 requested exclusion, nine filed objections to the settlement, and two others objected but filed nothing with the court.  All but three objectors are parties to this appeal.[3]

---

[3]     Dawn Weaver filed a timely objection in the trial court and an appeal from the order approving the settlement class.  However, at her request, we dismissed Weaver's appeal on June 25, 2015.

Of the 11,942 submitted claim forms, the settlement administrator determined that 11,620 were valid. This yielded a claim rate of nearly 14 percent, or almost three times the typical consumer class action claim-rate of 5 percent, according to the parties. The total estimated value of the claims was $895,365. Coupled with the costs charged by the settlement administrator and attorney fees, the total economic value of the settlement, plaintiffs asserted, was $2,413,338.40.

5. *The objections*

Two groups filed objections to the preliminary approval of the class and of the settlement agreement.

[[Begin nonpublished portion.]]

a. *The Restaino Objectors*

Mary Restaino, Geoffrey Yu, Theresa Stern Valentic, Betty Huang, and Zoe Herold (the Restaino Objectors), each of whom claimed to have suffered physical injury from defendants' creams, observed that the class definition included those who suffered physical injury whereas the named plaintiffs did not allege they suffered physical injury and sought only economic damages. Thus, the Restaino Objectors argued first that the settlement class was improperly certified because the named plaintiffs did not adequately represent class members who sustained personal injury. The Restaino Objectors also challenged the settlement as neither fair, reasonable, nor adequate because the certificates were not appropriate compensation for those class members who suffered personal injuries. The certificates also were nontransferable with the result they were worthless to class members who no longer wished to do business with defendants.

[[End nonpublished portion.]]

b. *The McLaren Objectors*

Donna McLaren, Rebecca McDonald, and Howard Clark (the McLaren Objectors) contended that the notice was deficient and precluded assumption of jurisdiction over the absent class members because notice was published in Parade Magazine only a quarter of the times required by the CLRA. (Civ. Code, § 1781, subd. (d).)

They also argued that the notice failed to mention that the creams contained prescription-only steroids as alleged in the complaint, in violation of California Rules of Court, rule 3.766. The McLaren Objectors further contended that the settlement was not fair, reasonable, or adequate in light of the strength and value of plaintiffs' claims that steroids are serious and harmful. They also argued that the release was ambiguous as it inartfully excluded personal injury claims. Finally, they took exception to class counsel's $1.2 million attorney fee award and the incentive award for the named plaintiffs.

In response to the objections, the parties amended the proposed judgment to make the certificates transferable.

[[End nonpublished portion.]]

6. *The trial court's ruling*

In May 2014, the trial court entered a final order approving the class and the stipulation of settlement.

[[Begin nonpublished portion.]]

The court found that the settlement was fair, reasonable, and adequate. The final order recognized that class members were given the opportunity to opt out and that the releases excepted from their ambit all "personal injury claims that Class Members may have arising from their use of the Products, which are expressly exempt from the Released Claims." The final order stated under "9. Binding Effect" that the terms of the stipulation and the final order and judgment would be forever binding on the parties and all class members, and that "Plaintiffs and Defendants agree, however, that *neither the terms of the Stipulation of Settlement, this Final Order, nor the accompanying Final Judgment bind Class Members to the extent they may have personal injury claims arising from their use of the Healing Cream or Control Cream. All such personal injury claims are not being settled in this Action.*" (Italics added.) Section "12. Release," read, under "(b)" "Plaintiffs and Defendants agree that the Release set forth in this Paragraph 12 and the Released Claims *do not mean or include any claims a Class Member may have*

8

*relating to personal injuries they may have suffered as a result of their use of the Products.*" (Italics added.)

The court granted plaintiffs' motion for incentive awards of $2,000 for plaintiff Choi and $3,000 for plaintiff Lee, and granted class counsel's attorney fee motion in part, by approving a multiplier of 1.8 over the lodestar, for a total of $864,324, plus $9,472 in costs. The Restaino and McLaren Objectors filed their timely appeals.

7. *The New Jersey lawsuit filed by the Restaino Objectors' attorneys*

We have taken judicial notice that two months after filing their notice of appeal, in September 2014, attorney Gary E. Mason, on behalf of all but one of the Restaino Objectors (Restaino, Yu, Huang and Valentic)[4] and numerous other plaintiffs, some of whom had opted out of the California settlement class, filed a personal injury action against defendants in New Jersey. The complaint asserts violation of the New Jersey product liability and consumer fraud acts, fraudulent concealment, strict liability, and negligence, among other causes of action. The complaint alleges that defendants failed to disclose that the creams contained corticosteroids which caused the plaintiffs to suffer physical injuries. The New Jersey complaint seeks personal injury as well as economic and punitive damages.

Defendants moved to dismiss the New Jersey complaint or to stay the lawsuit pending resolution of the appeal in this case on the ground, among others, that those class members who opted out of the California settlement could pursue both personal injury and non-personal injury damages in New Jersey, but the three plaintiffs who did not exclude themselves from the California settlement could only seek personal injury damages in New Jersey. At the hearing in New Jersey, counsel for defendants "maintain[ed] that *personal injury claims are not part of the California action and settlement.*" (Italics added.) Attorney Mason argued on behalf of the New Jersey plaintiffs that "we were told . . . you can go because [the California] settlement doesn't release personal injuries" and so the New Jersey plaintiffs "*are not seeking personal*

---

[4]     Zoe Herold, a Restaino objector, is not a plaintiff in the New Jersey lawsuit.

9

*injuries in California.  There is no pending complaint on their behalf for personal injuries in California*." (Italics added.)  The New Jersey court noted that the plaintiffs there "conceded on the record that certain plaintiffs will not be bringing economic claims in this action" and denied defendants' motion to dismiss the complaint there.

## CONTENTIONS

The Restaino Objectors contend that the trial court erred in certifying a settlement class because the named plaintiffs were inadequate class representatives.

The McLaren Objectors contend the notice of settlement was constitutionally and statutorily deficient, the settlement is not fair or adequate, the release is overly broad, and the attorney fee and incentive awards indicate collusion.

[[End nonpublished portion.]]

## DISCUSSION

[[Begin nonpublished portion.]]

### 1. *Standing*

As a preliminary matter, Betty Huang, a Restaino objector, does not have standing to participate in this appeal, despite her inclusion with the Restaino Objectors' February 26, 2014 filing.  Appeals may be taken only by aggrieved parties. (Code Civ. Proc., § 902.)  Appellants' "rights or interests must be injuriously affected by the judgment.  [Citation.]" (*Rebney v. Wells Fargo Bank* (1990) 220 Cal.App.3d 1117, 1128.)  The settlement agreement permitted class members to opt out of the class.  On February 23, 2014, three days before the Restaino objections were filed, Huang sent a timely exclusion (opt out) request and is a plaintiff in the New Jersey action seeking damages for personal injuries as well as non-personal injuries.  Having opted out, Huang is not bound by the judgment here and is not a party to, much less aggrieved by, the settlement.  Huang cannot be permitted to opt out, bring a separate action for personal injury damages, and simultaneously be part of the Restaino Objectors' appeal from the denial of their objections.

10

## 2. *Standard of review of the class action settlement*

Generally, "questions whether a settlement was fair and reasonable, whether notice to the class was adequate, whether certification of the class was proper, and whether the attorney fee award was proper are matters addressed to the trial court's broad discretion." (*Wershba v. Apple Computer, Inc*. (2001) 91 Cal.App.4th 224, 234-235 (*Wershba*).) In cases where there has been no antecedent certification of an adversarial class, trial courts should scrutinize class actions settlements more carefully (*Dunk v. Ford Motor Co*. (1996) 48 Cal.App.4th 1794, 1803, fn. 9 (*Dunk*)) to ensure that absent class members' rights are adequately protected. (Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2015) ¶ 14:138:20, p. 14-101.) However, "these concerns are satisfied by a careful fairness review of the settlement by the trial court." (*Wershba*, *supra*, at p. 240.)

Although the trial court's "inquiry must 'be especially careful and penetrating in a case such as this where class certification is deferred to the settlement stage.' [Citation.] . . . we . . . review the trial court's decision to approve a settlement [class] . . . under the 'abuse of discretion' standard." (*Carter v. City of Los Angeles* (2014) 224 Cal.App.4th 808, 820 (*Carter*).) Our review "is narrowly circumscribed. . . . 'and we afford that decision great deference on appeal, reversing only for a manifest abuse of discretion: . . . unless (1) it is unsupported by substantial evidence, (2) it rests on improper criteria, or (3) it rests on erroneous legal assumptions. [Citations.]' [Citations.]" (*Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004, 1022 (*Brinker*).) "To the extent that it appears the trial court's decision was based on improper criteria or rests upon erroneous legal assumptions, these are questions of law warranting our independent review. [Citations.]" (*Wershba*, *supra*, 91 Cal.App.4th at p. 235.)

## 3. *Certification of the class*

### a. *The named plaintiffs were adequate class representatives*.

Code of Civil Procedure section 382 authorizes class actions in California. To certify a class, courts must determine whether there is "an ascertainable and sufficiently

numerous class, a well-defined community of interest, and substantial benefits from certification that render proceeding as a class superior to the alternatives. [Citations.] 'In turn, the "community of interest requirement embodies three factors: (1) predominant common questions of law or fact; (2) class representatives with claims or defenses typical of the class; and (3) class representatives who can *adequately represent* the class." ' [Citations.]" (*Brinker*, *supra*, 53 Cal.4th at p. 1021, italics added; Code Civ. Proc., § 382; Civ. Code, § 1781, subd. (b); *Linder v. Thrifty Oil Co*. (2000) 23 Cal.4th 429, 435.)

The third factor, adequacy, is the result of due process and the res judicata effect of the class judgment on absent members. (*City of San Jose v. Superior Court* (1974) 12 Cal.3d 447, 463 (*City of San Jose*).) "To satisfy constitutional due process concerns, absent class members must be afforded adequate representation before entry of a judgment which binds them." (*Hanlon v. Chrysler Corporation* (9th Cir. 1998) 150 F.3d 1011, 1020 (*Hanlon*), citing *Hansberry v. Lee* (1940) 311 U.S. 32, 42-43.) Toward that end, courts consider two questions: (1) whether the class representatives are part of the class and possess the same interest and suffer the same injury as the class members, i.e., whether the class representatives have no conflict of interest with other class members (*J.P. Morgan & Co.*, *Inc. v. Superior Court* (2003) 113 Cal.App.4th 195, 212), and (2) whether the representative will " 'vigorously and tenaciously' " prosecute the interests of the absent class members. (*Simons v. Horowitz* (1984) 151 Cal.App.3d 834, 846; Weil & Brown, Cal. Practice. Guide: Civil Procedure Before Trial, *supra*, ¶ 14:36, p. 14-38.) A "party's claim of representative status will only be defeated by a conflict that ' "goes to the very subject matter of the litigation." ' [Citation.]" (*Capitol People First v. State Dept. of Developmental Services* (2007) 155 Cal.App.4th 676, 697.)

The Restaino Objectors contend that the named plaintiffs are inadequate class representatives because these plaintiffs did not suffer personal injury from the creams and so their interests conflict with those of the class, which as defined, includes purchasers who do claim to have experienced such injuries. The Restaino Objectors are concerned, because they fall within the class definition, that they will be barred by res judicata and

12

the prohibition against claim splitting from bringing personal injury lawsuits against defendants in the future.

At bottom, all objectors insist on characterizing this lawsuit as one seeking remedies for personal injuries arising from use of the creams. However, notwithstanding such claims may fall within the sweep of the class definition, they were withdrawn from adjudication by the settlement's releases, rendering this case nothing other than a garden variety non-personal injury consumer class action.

(i) *The settlement preserved class members' personal injury claims for future litigation with the result there is no conflict of interest that would render the named plaintiffs inadequate as representatives*.

"Under federal and California law, res judicata generally precludes parties or their privies from litigating in a second lawsuit issues that were or could have been litigated in a prior suit. [Citation.]" (*Louie v. BFS Retail & Commercial Operations, LLC* (2009) 178 Cal.App.4th 1544, 1554 (*Louie*).) It is likewise settled that a court-approved settlement pursuant to a final consent decree in a class action is considered a final adjudication and " 'will operate to bar subsequent suits by class members. [Citations.] . . . "A judgment entered . . . by consent or *stipulation*, is as conclusive a . . . bar as a judgment rendered after trial." [Citations.]' [Citations.]" (*Id*. at p. 1555, italics added.)

However, " '[*i*]*t is axiomatic that [a stipulated judgment's] res judicata effect extends only to those issues embraced within the consent judgment*. [Citations.] Thus, while a stipulated judgment normally concludes all matters put into issue by the pleadings, the parties can agree to restrict its scope by expressly withdrawing an issue from the consent judgment. [Citations.]' " (*Louie*, *supra*, 178 Cal.App.4th at p. 1559, italics added.) Res judicata will not apply to claims that the parties agreed in a court-approved stipulation to reserve for later litigation. (*Ellena v. State of California* (1977) 69 Cal.App.3d 245, 260-261.)

In *Louie*, the trial court sustained the defendant's demurrer to the plaintiffs' complaint alleging violation of California's Disabled Persons Act on the ground that res

judicata barred the action based on a consent decree in a Florida class action lawsuit alleging the defendant violated the Americans with Disabilities Act. The appellate court in *Louie* reversed because the final judgment in Florida approving the class certification and consent decree did not refer to state law and explained in a footnote that it " 'reflects the *deletion of damage claims that the parties voluntarily excised from the Proposed Consent Decree* . . . [and that] the issue of damages had been voluntarily excised and the case was limited to injunctive/declaratory relief.' " (*Louie*, *supra*, 178 Cal.App.4th at pp. 1547, 1557, italics added.) *Louie* discussed both federal and state law. (*Id.* at pp. 1558-1559.) It "observe[d] the commonsense statement in a plurality opinion" in *United States v. Seckinger* (1970) 397 U.S. 203 at page 206, footnote 6, agreeing that res judicata did not bar certain claims in a Georgia Federal District Court based on a prior judgment of a South Carolina District Court, because the latter court expressly left open the option for the claims to be pursued at a later time. (*Louie*, *supra*, at p. 1557.) California law is the same. (*Id.* at p. 1559, citing *Ellena v. State of California*, *supra*, 69 Cal.App.3d 245 [where parties expressly agree to withdraw issue from court, issue not adjudicated and not res judicata] & *Miller & Lux, Inc. v. James* (1919) 180 Cal. 38, 44-46 [stipulation not to offer certain evidence at trial amounted to "withdrawal of an issue from the consideration of the court" and so court's decision was not res judicata as to withdrawn issue].) Although *Louie* involved the question of whether an earlier lawsuit barred Louie's present California complaint, the appellate court in *Louie* held that under both federal and California law, the plaintiff's state law claims and damages were withdrawn from adjudication by consent of the parties. (*Louie*, *supra*, 178 Cal.App.4th at pp. 1558 & 1562.)

*Hanlon*, *supra*, 150 F.3d 1011, analyzed the binding effect of a present settlement. The *Hanlon* complaint in California asserted various causes of action arising from an alleged defect in the rear liftgate latches of the defendant's minivans. The parties submitted a settlement agreement for approval. (*Id.* at p. 1018.) As here, the district court issued an order granting preliminary approval of the settlement and certifying the nationwide class of owners of the defendant's minivan, but excluding from the settlement

14

all personal injury and death cases. (*Id*. at pp. 1018 & 1020.) The Ninth Circuit rejected the challenge to the adequacy of representation finding no conflict of interest between the named plaintiffs on the one hand and class members with personal injury claims on the other. Any differences in severity of injury or in treatment of the class members, *Hanlon* held, was avoided because "[n]o personal injury or wrongful death claims were included, and any class member who wished to do so could opt out of the settlement class." (*Id*. at p. 1021.)

*Louie* and *Hanlon* teach us that res judicata does not bar future litigation of claims and damages that are expressly excluded by the contracting parties from the release of claims in a stipulated class action settlement. The parties to the settlement agreement here expressly excluded from the agreement's release all claims for personal injury arising from the use of defendants' two creams. Thus, they withdrew such claims from adjudication in this lawsuit and from the court-approved settlement. Accordingly, no conflict of interest exists between the class representatives and the class members on the basis of personal injury, let alone a conflict that " ' "goes to the very subject matter of the litigation." ' " (*Capitol People First v. State Dept. of Developmental Services*, *supra*, 155 Cal.App.4th at p. 697.) Personal injury claims and the damages flowing therefrom were not extinguished by the judgment approving the stipulated settlement and so class members may pursue recovery on that basis in another lawsuit. (See *In re Toyota Motor Corp. Unintended Acceleration, Marketing, Sales Practices and Products Liability Litigation* (C.D.Cal. June 17, 2013, No. 8:10ML 02151 JVSFMOx) 2013 WL 3224585, [*14] [proposed settlement by "Economic Loss" class does not apply to personal injury, wrongful death, and physical property damage claims because those claims were carved out of the settlement for later litigation].)[5]

---

[5] Unpublished federal cases may be cited and found persuasive, although they are not precedential authority. (*Haligowski v. Superior Court* (2011) 200 Cal.App.4th 983, 990, fn. 4.)

15

The McLaren Objectors argue that the release is susceptible of misinterpretation and hence inadequately protects the rights of class members with personal injuries. They observe that at the hearing on the settlement, plaintiffs and defendants were required to clarify their own understanding of the effect of the release. We disagree. The exclusion from the release here is similar to that deemed effective to preserve causes of action in *Louie*, which provided, " 'The release does not include claims for individual damages, that otherwise might be available under state law or local ordinance.' " (*Louie*, *supra*, 178 Cal.App.4th at p. 1561, italics omitted.)[6] [7]

Nor does the settlement agreement improperly force class members to split their personal injury claims. " 'The rule against splitting a cause of action . . . is in part a rule of *abatement* and in part a rule of *res judicata*.' [Citation.]" (*Grisham v. Philip Morris U.S.A., Inc*. (2007) 40 Cal.4th 623, 642.) While "[a] long-established rule prohibits the splitting of a single cause of action so as to permit successive actions on parts of the claim" for the same injury (7 Witkin, Cal. Procedure (5th ed. 2008) Judgment, § 406, p. 1041), a generally recognized exception occurs when the defendant, "by acquiescing in the procedure in the first action, [is] estopped to object in the second action. [Citations.]" (*Id*., § 405, at p. 1040, citing *United Bank & Trust Co. v. Hunt* (1934) 1 Cal.2d 340, 345 ["The course pursued by the court and counsel . . . was tantamount to *an express determination . . . to reserve the issues involved for future adjudication*," italics added].) In light of the fact that all personal injury claims and compensation therefore were not adjudicated in this case and have been reserved for future litigation, no splitting of personal injury claims is threatened. Unlike in *City of San Jose*, where the class action

---

[6]     We reject the McLaren Objector's argument based on *Molski v. Gleich* (9th Cir. 2003) 318 F.3d 937, for the same reason that *Louie* rejected the defendant's reliance on *Molski*. (*Louie*, *supra*, 178 Cal.App.4th at pp. 1561-1562.) *Molski* did not involve res judicata, but was a direct appeal from the certification of a class based on notice issues, among other things.

[7]     We are unpersuaded by the unpublished federal cases and cases from outside of California cited by the Restaino Objectors.

sought only one of many available measures of damages for nuisance (*City of San Jose*, *supra*, 12 Cal.App.4th at p. 464), here, all personal-injury damages, which are necessarily based on causes of action not alleged, have been withdrawn from adjudication and settlement, with the result that no splitting has occurred. The named plaintiffs are not inadequate representatives merely because class members might also have individual causes of action for such injury in another lawsuit. (*Beck-Ellman v. Kaz USA, Inc.* (S.D.Cal. 2012) 283 F.R.D. 558, 566-567.) As the Southern District of California noted, " '[d]efendant[s] cannot claim that Plaintiff is inadequate because [she] declines to assert a theory that could unravel the putative class.' [Citation.]" (*Id*. at p. 566 [noting courts routinely certify diminished value/overpayment claims where the underlying product also causes personal injury or property damage]; see also *In re Conseco Life Ins. Co. LifeTrend Ins. Sales* (N.D.Cal. 2010) 270 F.R.D. 521, 531-532.)[8]

Lest there be any doubt about the result, defendants' attorneys stated at oral argument in the trial court, "we made it absolutely clear [in the settlement agreement] that the personal injuries will not be settled." Defendants always understood that the release excluded all personal injury claims. Although the res judicata effect can only be tested in a subsequent action (*Louie*, *supra*, 178 Cal.App.4th at p. 1560), "it would be unjust to allow [defendants] to invoke res judicata to bar [personal injury] claims." (*Id*. at p. 1562.) Having agreed to exclude personal injury claims from the releases, and having represented as much both here and in the New Jersey court, defendants will not be heard to raise a res judicata or collateral estoppel bar to such claims. (See 7 Witkin, *supra*, Judgment, § 405, p. 1040; *Louie*, *supra*, at p. 1562.) Similarly, three of the Restaino

---

[8]     The Restaino Objectors' reliance on *Cholakyan v. Mercedes-Benz USA, LLC* (C.D.Cal. 2012) 281 F.R.D. 534, is unavailing. There, the court declined to certify an adjudicatory class seeking an injunction and declaration that the defendant's cars possessed a defectively designed water management system because it might defeat a class member's effort to obtain compensatory damages for that very same defect. (*Id*. at p. 564.) That case did not involve a settlement class. Here, by contrast, nothing related to physical injury has been adjudicated or settled, and so that issue would not be precluded in a later suit.

17

Objectors, who are plaintiffs seeking personal injury damages in the New Jersey class action, represented to the New Jersey court that plaintiffs "*are not seeking personal injuries in California. There is no pending complaint on their behalf of personal injuries in California.*" (Italics added.) The New Jersey court agreed and denied defendants' motion to dismiss the complaint.[9] Therefore, all parties are estopped to argue that personal injury claims were adjudicated in this lawsuit.

(ii) *The named plaintiffs protected the class members' interests and so they were adequate representatives.*

Turning to the second adequacy inquiry, the vigor with which the named representatives and class counsel pursued the common claims (*Simons v. Horowitz*, *supra*, 151 Cal.App.3d 834, 846), the Restaino Objectors argue that the class representatives did not protect the interests of those who suffered personal injury in that the representatives made no effort to obtain discovery relevant to personal injury or of the underlying claims, and rushed to settlement by beginning negotiations three months after filing the complaint. We disagree.

During discovery, plaintiffs and class counsel were able to obtain a settlement term excluding personal injury claims from the release and so individual, personal-injury claims were not litigated in this case with the result no investigation into such claims was required. Hence, the concerns of the Supreme Court in *City of San Jose* are not implicated. (*City of San Jose*, *supra*, 12 Cal.3d at p. 464 [holding inadequate

---

[9] We disagree with defendants that the Restaino Objectors lack standing and are estopped from arguing that their personal injury claims will be improperly compromised by the stipulated settlement here because of the statements their attorneys made in the New Jersey proceeding. First, one Restaino objector, Zoe Herold is not a party to the New Jersey action. Second, general releases are common in class action settlements. (*Carter*, *supra*, 224 Cal.App.4th at pp. 820-821.) Class members unhappy with the scope of the release can seek to rectify it through objection or intervention, and appeal if not satisfied with the result. (*Ibid.*) The Restaino Objectors appeared at the fairness hearing and objected to the proposed settlement with the result they have standing to appeal. (*Wershba*, *supra*, 91 Cal.App.4th at p. 235.) Accordingly, we reject the suggestion that the Restaino Objectors' appeal is frivolous.

18

representation where named plaintiffs failed to raise claims reasonably expected to be raised by members of class thereby depriving class of some elements of damage].) Otherwise, the record shows that the named plaintiffs and class counsel engaged in extensive discovery, both before and during the settlement negotiations, aimed at the complaint's allegations that were not ultimately excluded from the releases. Counsel tested the product, mailed notice letters to defendants, engaged in motion practice and formal and informal discovery that included three sets of interrogatories, and numerous document demands and requests for admission, some of which was ordered by the trial court upon motion by class counsel, that uncovered, among other things, a second cream containing hydrocortisone and triamcinolone acetonide. The settlement was the product of extensive negotiations both before a neutral mediator and in independent sessions. The trial court was well aware of the battle waged between plaintiffs and defendants.

We disagree with the Restaino Objectors' suggestion that, because no depositions were taken, the lawsuit was not vigorously prosecuted and more discovery should have been conducted before the parties settled. "[T]hat no class action can be settled until the last particle of discovery has been completed and analyzed is not the law. '[I]n the context of class action settlements, "formal discovery is not a necessary ticket to the bargaining table" where the parties had sufficient information to make an informed decision about settlement. . . . [Citation.] . . . . "[N]otwithstanding the status of discovery, plaintiffs' negotiators had access to a plethora of information regarding the facts of their case." ' [Citations.]" (*7-Eleven Owners for Fair Franchising v. Southland Corp*. (2000) 85 Cal.App.4th 1135, 1150 (*7-Eleven Owners*).) If the parties and the court have sufficient information to act intelligently (*Wershba*, *supra*, 91 Cal.App.4th at p. 245), requiring additional discovery would only undermine California's strong public policy favoring settlement of disputes (*Kaufman v. Goldman* (2011) 195 Cal.App.4th 734, 745), even in large class action litigation. (*7-Eleven Owners*, *supra*, at p. 1151.) The trial court did not abuse its discretion in concluding that the named plaintiffs adequately represented the class.

[[End nonpublished portion.]]

19

b. *Notice*

(i) *The method of giving notice did not violate the CLRA.*

The McLaren Objectors contend that the method of giving notice was constitutionally infirm because the court was not free to disregard the notice requirement in CLRA, Civil Code section 1781, subdivision (d). They do not challenge the selection of Parade Magazine as an appropriate publication. Instead, they argue that the court's error lay in allowing publication there only once.

"We exercise our independent judgment in the review of pure questions of law, such as the interpretation of statutes, and application of a statute to undisputed facts. [Citations.]" (*Powerhouse Motorsports Group, Inc. v. Yamaha Motor Corp., U.S.A.* (2013) 221 Cal.App.4th 867, 877.) " ' "It is a settled principle in California law that 'When statutory language is . . . clear and unambiguous there is no need for construction, and courts should not indulge in it.' " [Citation.]' [Citation.]" (*California Ins. Guarantee Assn. v. Workers' Comp. Appeals Bd.* (2004) 117 Cal.App.4th 350, 355.)

Subdivision (d) of section 1781 of the Civil Code reads, "If the action is permitted as a class action, the court may direct either party to notify each member of the class of the action. The party required to serve notice *may*, with the consent of the court, if personal notification is unreasonably expensive or it appears that all members of the class cannot be notified personally, give notice as prescribed herein by publication in accordance with Section 6064 of the Government Code in a newspaper of general circulation in the county in which the transaction occurred." (Italics added.) Section 6064 of the Government Code in turn, reads in part that "Publication of notice pursuant to this section *shall* be once a week for four successive weeks." (Italics added.)

Clearly, subdivision (d) of section 1781 of the Civil Code does not apply to this case involving a *settlement* class. By its terms, subdivision (d) concerns notice when a class action is "permitted" -- i.e., when a court certifies a class for adjudication. To "permit" means "[t]o suffer, allow, consent, let; to give leave or license; to acquiesce, by failure to prevent, or to expressly assent or agree to the doing of an act." (Black's Law

20

Dict. (6th ed. 1990) p. 1140, col. 1; accord, Webster's 3d New Internat. Dict. (1971) p. 1683, col. 3.)

Notice of a proposed class action *settlement*, in contrast, is governed by subdivision (f) of section 1781 of the Civil Code, which reads, "[a] class action *shall not be* dismissed, *settled*, or compromised without the approval of the court, and notice of the proposed dismissal, settlement, or compromise *shall* be given in such manner as the court directs to each member who was given notice pursuant to subdivision (d) and did not request exclusion." (Italics added; cf. *Rebney v. Wells Fargo Bank*, *supra*, 220 Cal.App.3d at p. 1138, fn. 6. [noting in dicta that Civ. Code, § 1781, subd. (d) applies when a class action is permitted, whereas subd. (f) governs notice of a proposed settlement].) Unlike subdivision (d) of section 1781 of the Civil Code, subdivision (f) mandates that notice of a settlement class be given "as the court directs," thus granting the trial court discretion to fashion notice of a settlement class, provided the court orders that notice be sent "to each member who was given notice pursuant to subdivision (d)." (Civ. Code, § 1781, subd. (f).) As notice was not given pursuant to subdivision (d) here, the court had " 'virtually complete discretion as to the manner of giving notice to class members.' " (*7-Eleven Owners*, *supra*, 85 Cal.App.4th at p. 1164; *Gainey v. Occidental Land Research* (1986) 186 Cal.App.3d 1051, 1057.)

Furthermore, it is infeasible to comply with the requirement in Civil Code section 1781, subdivision (d) to give notice in "a newspaper of general circulation in the county in which the transaction occurred." Determining in which counties around the United States sales of the creams occurred in this case would be impossible. Civil Code section 1781 does not appear to govern nationwide consumer class actions. The McLaren Objectors have not demonstrated that Civil Code section 1781, subdivision (d) applies to require four-times notice to a nationwide settlement class, particularly where other class claims were alleged and all of the remedies were obtained under causes of action other than the CLRA.

California has abundant authority providing guidance to trial courts when fashioning notices of class action settlements. (See generally Weil & Brown, Cal.

Practice Guide: Civil Procedure Before Trial, *supra*, ¶ 14:117 et seq., pp. 14-86 et seq.;

Cal. Rules of Court, rule 3.766; see also *7-Eleven Owners*, *supra*, 85 Cal.App.4th at

p. 1164; accord, *Cellphone Termination Fee Cases* (2010) 186 Cal.App.4th 1380, 1390-

1393.)  The McLaren Objectors do not challenge the constitutionality of the notice

method for any of the other causes of action alleged in the complaint.  Therefore, because

Civil Code section 1781, subdivision (d) is inapplicable, the McLaren Objectors have not

demonstrated that notice was rendered constitutionally infirm merely because publication

was made once in Parade Magazine rather than four times.

[[Begin nonpublished portion.]]

(ii) *The content of the notice was not deficient*.

The McLaren Objectors challenge the content of the notice contending that it was

deficient and violated California Rules of Court, rule 3.766(d),[10] because it failed to

include "the basic contention" that the creams contained corticosteroids.[11]  They note that

the word "steroids" is absent from the stipulation of settlement, the claim form, and the

settlement documents.  Only by reading the complaint itself would class members

comprehend that the lawsuit involved allegations that the ingredients that defendants

failed to disclose were steroids.  The McLaren Objectors argue, as the result of the

---

[10]     California Rules of Court, rule 3.766(d) reads:  "The content of the class notice is
subject to court approval.  If class members are to be given the right to request exclusion
from the class, the notice must include the following: [¶]  (1) A brief explanation of the
case, including *the basic contentions* or denials of the parties; [¶]  (2) A statement that the
court will exclude the member from the class if the member so requests by a specified
date; [¶]  (3) A procedure for the member to follow in requesting exclusion from the
class;  [¶]  (4) A statement that the judgment, whether favorable or not, will bind all
members who do not request exclusion; and [¶]  (5) A statement that any member who
does not request exclusion may, if the member so desires, enter an appearance through
counsel."  (Italics added.)

[11]     The description of the lawsuit in the summary notice and in the long form notice
state variously that defendants violated state and federal marketing laws by "fail[ing] to
disclose all of the ingredients used in the . . . products" and "failing to disclose all of their
ingredients."

22

notice's deficiency, that some class members could read the entire notice and make a claim without understanding that the symptoms they were suffering might have been caused by defendants' products, thus defeating the purpose of notice.

As noted, the trial court " 'has virtually complete discretion as to the manner of giving notice to class members.' " (*7-Eleven Owners*, *supra*, 85 Cal.App.4th at p. 1164.) In the context of a settlement, "[t]he purpose of a class notice . . . is to give class members sufficient information to decide whether they should accept the benefits offered, opt out and pursue their own remedies, or object to the settlement. [Citation.]" (*Wershba*, *supra*, 91 Cal.App.4th at p. 252; *Litwin v. iRenew Bio Energy Solutions*, *LLC* (2014) 226 Cal.App.4th 877, 883, citing Cal. Rules of Court, rule 3.769(f).) We conclude that the absence of the word "steroid" from the notices does not render them deficient.

First, the steroid allegations were available to class members. All forms of notice directed the class members who wanted additional information to the settlement website and the toll free number for more detailed information. The website contained links to the complaint itself with all of its references to steroids. Utilizing a summary notice that directs class members to a website containing more detailed notice and information has been approved by courts in California. (*Chavez v. Netflix, Inc*. (2008) 162 Cal.App.4th 43, 58; accord, *Cellphone Termination Fee Cases*, *supra*, 186 Cal.App.4th at p. 1392.)

The McLaren Objectors disagree that the complaint's presence on the settlement website was sufficient, arguing that there was no evidence to support the conclusion that class members had internet access, given that more than 50 percent of defendants' sales were to retailers and some portion of the remaining direct sales occurred at defendants' spa. However, both the case law and the rules of court recognize that posting notice on the internet is acceptable. (Cal. Rules of Court, rule 3.766(f) [listing as "means of notice reasonably calculated to apprise the class members," "broadcasting on . . . the Internet"]; *Chavez v. Netflix, Inc*. *supra*, 162 Cal.App.4th at p. 58 & *Cellphone Termination Fee Cases*, *supra*, 186 Cal.App.4th at p. 1392.) Moreover, for those who did not have internet access, a toll free telephone number was prominently listed on all notices.

23

Second and more important, the tone of notice must be impartial.  "As a general rule, class notice must strike a balance between thoroughness and the need to avoid unduly complicating the content of the notice and confusing class members."  (*Wershba*, *supra*, 91 Cal.App.4th at p. 252.)  Trial courts evaluating the content of a settlement-only class notice must " 'assure that the notice be "neutral and objective in tone, neither promoting nor discouraging the assertion of claims." [Citation.]  [¶] . . .  "It is essential that the class members' decision to participate or to withdraw be made on the basis of independent analysis of [their] own self-interest. . . .  [¶]  The . . . class notice . . . is designed to present the relevant facts in an unbiased format." '  [Citation.]" (*Hernandez v. Vitamin Shoppe Industries Inc*. (2009) 174 Cal.App.4th 1441, 1454-1455.)  Here, advising the class members that the undisclosed ingredients were certain forms of corticosteroids is certainly important to class members who suffered personal injury.  Yet, this case does not involve personal injury claims.  The effect of inserting the word "steroids" in the notices would be to unnecessarily confuse class members in a case related only to labeling and marketing issues where the identity of the omitted ingredients is not the point, and where compensation was for non-personal injury.  The only purpose served by including the word "steroid" in the notice therefore would be to educate class members about a ground for bringing an entirely new personal injury suit against defendants.  Such an advertisement for new lawsuits is neither neutral, objective, nor unbiased in tone.  (*Ibid.*)

4. *Approval of the settlement*

" ' " '[T]o prevent fraud, collusion or unfairness to the class, the settlement or dismissal of a class action requires court approval.' " ' [Citations.]  The court must determine the settlement is fair, adequate, and reasonable. [Citations.]" (*Dunk*, *supra*, 48 Cal.App.4th at pp. 1800-1801.)  " 'Due regard,' . . . 'should be given to what is otherwise a private consensual agreement between the parties.  The inquiry "must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned."

24

[Citation.] . . . .' " (*7-Eleven Owners*, *supra*, 85 Cal.App.4th at p. 1145, quoting from *Dunk*, *supra*, at p. 1801.)

Factors the trial court should consider in assessing whether a class settlement is fair, adequate, and reasonable include, " '[(1)] the strength of plaintiffs' case, [(2)] the risk, expense, complexity and likely duration of further litigation, [(3)] the risk of maintaining class action status through trial, [(4)] the amount offered in settlement, [(5)] the extent of discovery completed and the stage of the proceedings, [(6)] the experience and views of counsel, [(7)] the presence of a governmental participant, and [(8)] the reaction of the class members to the proposed settlement.' [Citations.]" (*Wershba*, *supra*, 91 Cal.App.4th at pp. 244-245, quoting from *Dunk*, *supra*, 48 Cal.App.4th at p. 1801.) This is not an exclusive list of considerations. "[T]he court is free to engage in a balancing and weighing of factors depending on the circumstances of each case. [Citation.]" (*Wershba*, at p. 245.)

Our review remains limited. (*Munoz v. BCI Coca-Cola Bottling Co. of Los Angeles* (2010) 186 Cal.App.4th 399, 407 (*Munoz*).) "Great weight is accorded the trial judge's views." (*7-Eleven Owners*, *supra*, 85 Cal.App.4th at p. 1145.) "[B]ecause so many imponderables enter into the evaluation of a settlement, we continue to review the trial court's decision to approve a settlement in such a case under the 'abuse of discretion' standard." (*Carter*, *supra*, 224 Cal.App.4th at p. 820.) We do not reweigh the factors the trial court should consider, "or substitute our notions of fairness for those of the trial court. [Citation.]" (*Wershba*, *supra*, 91 Cal.App.4th at p. 245.) Our task is "only to determine whether the trial judge . . . acted within its discretion. [Citation.]" (*Munoz*, *supra*, at p. 410.)

Relying in large part on *Kullar v. Foot Locker Retail, Inc*. (2008) 168 Cal.App.4th 116 (*Kullar*), the factors the McLaren Objectors focus on are the first and fourth, namely the " ' "strength of the case for plaintiffs on the merits, balanced against the amount offered in settlement." ' " (*Id*. at p. 130.) They argue that the parties and the court misconceived the nature and magnitude of plaintiffs' case which undermined the trial court's ability to evaluate the risk of continued litigation against the value of the relief in

25

settlement. Instead, they contend there was (1) "almost certain liability on Plaintiffs' claims," (2) class members were entitled to "full restitution of all amounts class members paid," and (3) there was a "strong possibility of exemplary damages."

*Kullar* explained that " 'to protect the interests of absent class members, the court must independently and objectively analyze the evidence and circumstances before it.' " (*Kullar*, *supra*, 168 Cal.App.4th at p. 130.) " '[T]he factual record before the . . . court must be sufficiently developed' [citation]," and show that the trial court "independently satisf[ied] itself that the consideration being received for the release of the class members' claims is reasonable in light of the strengths and weaknesses of the claims and the risks of the particular litigation." (*Id.* at pp. 129-130.) *Kullar* reversed the class settlement approval because the record contained *no* evidence that the trial court had conducted its evaluation independently. The supporting information was exchanged in confidential mediation and so the papers submitted to the trial court "provided no specificity." (*Id.* at pp. 129 & 131; compare *7-Eleven Owners*, *supra*, 85 Cal.App.4th 1135, [trial court record contained extensive evidence of fairness and adequacy after years of litigation and days of hearing, and the trial court was informed of details, dollar value of claims, defenses, and counsels' evaluation of the strengths of claims].)

There is a presumption of fairness, however, on which plaintiffs rely in defending the settlement. This presumption arises when "(1) the settlement is reached through arm's-length bargaining; (2) investigation and discovery are sufficient to allow counsel and the court to act intelligently; (3) counsel is experienced in similar litigation; and (4) the percentage of objectors is small." (*Dunk*, *supra*, 48 Cal.App.4th at p. 1802.) As we have analyzed, all four of the factors are indisputably present in this case giving rise to the presumption of fairness.

Focusing particularly on the " ' " 'strength of the case for plaintiffs on the merits, balanced against the amount offered in settlement' " ' " (*Munoz*, *supra*, 186 Cal.App.4th at pp. 407-408; *Kullar*, *supra*, 168 Cal.App.4th at p. 130), the factual record before the trial court was more than adequately developed to allow the court independently and objectively to satisfy itself about the fairness and adequacy of the settlement. The record

26

contains reams of discovery and motion papers showing the extent to which the issues were contested. The record shows the details of the lawsuit. The complaint alleges that the class members overpaid for the creams because, had they been aware of the ingredients, they would not have purchased cream, would have paid less, or would have purchased a competing product. The record shows the amount in controversy. (*Munoz*, *supra*, at p. 409.) Extensive discovery was made of defendants' revenue from each type of cream at each point of sale during the class period. The court also had information about the range of outcomes of litigation (*ibid.*) having heard about the need for expert witnesses and the defenses defendants intended to raise if the case went to trial, along with the evaluation of the strengths of plaintiffs' position. The court evaluated the case and concluded it is a consumer class action seeking economic damages only for use of cosmetics, but excluding all personal injury claims. It was the court's assessment that "it is far from clear that this would be a slam dunk winner to get a full recompense for the full price paid."

The McLaren Objectors argue that the error in approving the settlement was a legal one in that the trial court misconceived the law concerning the strength of plaintiffs' case and the defenses defendants threatened to raise. As for the strength, the McLaren Objectors cite a raft of state and federal statutes covering adulteration, false advertising labeling of cosmetics, and dispensing of drugs, which statutes they believed support their view of the case. They argue, "*if true*, the factual allegations" mean "*almost* certain liability" because defendants' conduct of adulterating the creams with drugs was flatly illegal, and offset is not an applicable defense. (Italics added.) We disagree. First, many of the statutes the McLaren Objectors cite are redundant of those alleged in the complaint or are not applicable here. Hydrocortisone and triamcinolone acetonide are not Schedule III controlled substances (Health & Saf. Code, § 11056; 21 U.S.C. § 812) whose use without a prescription would be illegal. Indeed, hydrocortisone does not require a prescription. Second, the trial court did not misunderstand the scope of this case. It reasonably assessed, given the personal injury claims were not adjudicated here, that the parties were not litigating or settling the physical consequences of adulterating

27

the creams with drugs, and so the damages were purely economic. Third, as the McLaren Objectors were well aware, there is no certainty in litigation and defendants remain adamant that the complaint's allegations are not true. "[T]he merits of the underlying class claims are not a basis for upsetting the settlement of a class action; the operative word is 'settlement.' [Citations.]" (*7-Eleven Owners*, *supra*, 85 Cal.App.4th at p. 1150.) " '[I]t is the very uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlements. The proposed settlement is not to be judged against a hypothetical or speculative measure of what *might* have been achieved by the negotiators.' " (*Linney v. Cellular Alaska Partnership* (9th Cir. 1998) 151 F.3d 1234, 1242.)[12]

Turning to the amount offered in settlement, the parties hotly disputed the measure and extent of the recovery. Plaintiffs sought restitution of all amounts paid for the creams based on defendants' revenue from the sale of the products, which could require expert evaluation and testimony. (See *Colgan v. Leatherman Tool Group, Inc.* (2006) 135 Cal.App.4th 663, 700.) In contrast, defendants took the position that the recovery must be discounted by the benefit derived by consumers of the product. (See, e.g., *Ries v. Arizona Beverages USA LLC* (N.D.Cal. 2012) 287 F.R.D. 523, 532 [proper measure of restitution is difference between value of AriZona Iced Tea billed as all-natural and value of comparable beverage not marketed or sold at premium because of those claims]; *In re Facebook, Inc., PPC Advertizing Litigation* (N.D.Cal. 2012) 282 F.R.D. 446, 461

---

[12]     The McLaren Objectors argue, citing *Steroid Hormone Product Cases* (2010) 181 Cal.App.4th 145, that the trial court erred in concluding that the creams were beneficial to some class members while being harmful to others because this is an irrelevant factor. Their argument is unavailing. The court in that case examined a challenge to the typicality requirement of class certification of a CLRA cause of action and explained where the plaintiff was seeking restitution, he "correctly argues that he is entitled to show that [the defendant's] alleged deceptive conduct caused the same damage to the class by showing that the alleged misrepresentation was material, even if [defendant] might be able to show that some class members would have bought the products even if they had known they were unlawful to sell or possess without a prescription." (*Id*. at pp. 156-157.)

28

[restitution under UCL is difference between what plaintiffs paid and the value of what plaintiffs received].) The settlement provided for the recovery plaintiffs sought. Also, the record indicates that the face value of the certificates is worth more than the purchase price of the creams. Therefore, not only is the settlement very generous, it is better than that which the McLaren Objectors urge.

In any event, a review of the record reveals that the McLaren Objectors raised these same arguments in the trial court, both in their papers and at oral argument. The court engaged in a long discourse with the McLaren Objectors' attorney about counsel's view of nature of the case. The court found that "[t]he undisclosed steroid component appears to have made the product more dangerous for some users and more beneficial for others" and rejected the McLaren Objectors' invitation to view this case as a guaranteed win for plaintiffs. The record was sufficiently developed to enable the trial court, as it did, to exercise its discretion in evaluating the fairness and reasonableness of the settlement.

Finally, the McLaren Objectors challenge the certificates. They contend the certificates do not compare favorably to defendants' "actual potential exposure" because the coupons are negotiable only at defendants' store, are not transferrable, cannot be redeemed for cash, and customers do not get cash back if their purchase is under $45. The certificates *are transferrable*. Also, settlements that provide for a coupon or certificate are not inappropriate in California. (*Chavez v. Netflix, Inc.*, *supra*, 162 Cal.App.4th at pp. 53-54.) To paraphrase *Chavez*, although the certificates might induce a class member to make a purchase he or she might not otherwise make, which would provide a net benefit to defendants, here class members are not being offered a discount that requires them to make a new purchase. Rather, the $45 certificates, which are worth more than the typical purchase price of either the Healing or Control Cream, can be transferred or used to obtain up to $45 worth of a wide variety of replacement products *at no charge*. We also disagree with the McLaren Objectors that the injunctive relief portion of the settlement had no value. Defendants stopped selling the creams after

29

the lawsuit was filed and the permanent injunction ensures that in the future, the public will no longer be exposed to this sort of misleading labeling and advertising.

### 5. *The attorney fee award*

The McLaren Objectors challenge the attorney fees awarded to class counsel. Their sole contention is that the clear sailing provision was excessive and a red flag signaling collusion. They rely on *In re Bluetooth Headset Products Liability* (9th Cir. 2011) 654 F.3d 935, which said that "clear sailing" provisions and clauses reverting unpaid attorney's fees to the defendant deserve heightened scrutiny to avoid collusion. (*Id*. at p. 947.)

Generally, a clear sailing agreement is one in which the defendant agrees not to contest the amount to be awarded by the trial court so long as the award falls beneath a negotiated ceiling. (*Cellphone Termination Fee Cases* (2009) 180 Cal.App.4th 1110, 1120.) There is no absolute prohibition on clear sailing agreements in California, where they are common. (See *Consumer Privacy Cases* (2009) 175 Cal.App.4th 545, 553 ["commentators have agreed that such an agreement is proper"].) Trial courts peruse fee provisions in class action settlement agreements for the reasonableness of the award and for evidence of fraud or collusion. (*Cellphone Termination Fee Cases*, *supra*, at p. 1119.) "From the class members' perspective, review of the reasonableness of the fee award is a safeguard against the possibility of collusion." (*Ibid.*) We review the attorney fee award in the settlement of a class action under the abuse of discretion standard. (*7-Eleven Owners*, *supra*, 85 Cal.App.4th at p. 1164.)

Here, the trial court expressly found that the fee award was reasonable under the circumstances. When the court made this determination, it had extensive documentation and heard argument. The court also addressed the possibility of collusion raised by the presence of a clear sailing clause in the fee agreement. The court explained, had the class been a smaller 20,000 members with coupons worth $1.2 million, then the clear sailing provision of $1.2 million in attorney fees "would be excessive." But the class was more than four times that number. The court independently evaluated the fee request and only granted the attorney fee motion in part, by awarding fees based on a loadstar of $600 per

hour and a multiplier of 1.8 for a total of $864,342 -- or 72 percent of the request -- which amount it deemed was reasonable.  Alert to its responsibility, the court properly exercised its discretion and examined the fee request.

[[End nonpublished portion.]]

### DISPOSITION

The judgment is affirmed.  Appellants to bear costs on appeal.

### CERTIFIED FOR PARTIAL PUBLICATION

ALDRICH, J.

We concur:

EDMON, P. J.

LAVIN, J.

31